**WO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy R. Deiman, | No. CV-15-00161-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, | |
| Defendant. | |

Plaintiff Jeremy Deiman seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security ("the Commissioner"), which denied him disability insurance benefits and supplemental security income under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. Because the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and is not based on legal error, the Commissioner's decision is affirmed.

**I. Background**

### A. Factual Background

Deiman, a thirty-five-year-old male, has a General Equivalency Degree. Between 1999 and 2011, he worked over thirty short-term jobs in which he resigned or was terminated due to his inability to get along with coworkers and supervisors. (Doc. 16 at 2, 6.) He suffers from "mental illness with associated mood swings, anxiety, panic attacks, depression, suicide thoughts/attempts, and social interaction problems. (*Id.* at 2.)

**B. Procedural History**

On November 28, 2011, Deiman applied for disability insurance benefits and supplemental security income, alleging disability beginning August 19, 2010.  (A.R. 25.)[1] On July 23, 2013, he appeared with his attorney and testified at a hearing before the ALJ.  A vocational expert also testified.

On September 3, 2013, the ALJ issued a decision that Deiman was not disabled within the meaning of the Social Security Act.  The Appeals Council denied Deiman's request for review of the hearing decision, making the ALJ's decision the Commissioner's final decision.  On January 30, 2015, Deiman sought review by this Court.

**II.  Legal Standard**

The district court reviews only those issues raised by the party challenging the ALJ's decision.  *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  Substantial evidence is more than a scintilla, less than a preponderance, and relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole.  *Id.*  In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence."  *Id.* As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

**III.  Five-Step Sequential Evaluation Process**

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process.  20 C.F.R. § 404.1520(a).  The claimant bears

---

[1] Deiman amended his original alleged onset date during the hearing.  (A.R. 47.)

1  the burden of proof on the first four steps, but at step five, the burden shifts to the

2  Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

3  At the first step, the ALJ determines whether the claimant is engaging in

4  substantial gainful activity.   20 C.F.R. § 404.1520(a)(4)(i).   If so, the claimant is not

5  disabled and the inquiry ends. *Id.*  At step two, the ALJ determines whether the claimant

6  has a "severe" medically determinable physical or mental impairment.

7  § 404.1520(a)(4)(ii).  If not, the claimant is not disabled and the inquiry ends. *Id.*  At step

8  three, the ALJ considers whether the claimant's impairment or combination of

9  impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P

10  of 20 C.F.R. Pt. 404.  § 404.1520(a)(4)(iii).  If so, the claimant is automatically found to

11  be disabled. *Id.*  If not, the ALJ proceeds to step four.  At step four, the ALJ assesses the

12  claimant's residual functional capacity ("RFC") and determines whether the claimant is

13  still capable of performing past relevant work.  § 404.1520(a)(4)(iv).  If so, the claimant

14  is not disabled and the inquiry ends. *Id.*  If not, the ALJ proceeds to the fifth and final

15  step, where he determines whether the claimant can perform any other work based on the

16  claimant's RFC, age, education, and work experience.  § 404.1520(a)(4)(v).  If so, the

17  claimant is not disabled. *Id.*  If not, the claimant is disabled. *Id.*

18  At step one, the ALJ found that Deiman meets the insured status requirements of

19  the Social Security Act through March 31, 2012, and that he has not engaged in

20  substantial gainful activity since January 1, 1999.  (A.R. 27.)  At step two, the ALJ found

21  that Deiman has the following severe impairments: major depressive disorder, obsessive

22  compulsive disorder (OCD) and borderline personality disorder.  (*Id.*)  At step three, the

23  ALJ determined that Deiman does not have an impairment or combination of

24  impairments that meets or medically equals an impairment listed in Appendix 1 to

25  Subpart P of 20 C.F.R. Pt. 404.  (*Id.* at 30.)

26  At step four, the ALJ found that Deiman has the RFC to perform "a full range of

27  work at all exertional levels but with the following nonexertional limitations:   The

28  claimant can interact with coworkers and supervisors, but is precluded from jobs

- 3 -

1   requiring public contact.  He is limited to simple, routine and unskilled work." (*Id.* at 31-

2   32.)  The ALJ further found that Deiman has no past relevant work.  (*Id.* at 36.)  At step

3   five, the ALJ concluded that, considering Deiman's age, education, work experience, and

4   RFC, there are jobs that exist in significant numbers in the national economy that he

5   could perform.  (*Id.*)

6   **IV.  Analysis**

7          Deiman argues the ALJ's decision is unsupported by substantial evidence for three

8   reasons:  (1) the ALJ improperly discounted Deiman's credibility regarding the severity

9   of his symptoms, (2) the ALJ improperly weighed the medical opinion evidence in the

10  record, and (3) the ALJ improperly relied on the Medical-Vocational Guidelines at Step

11  Five.  (Doc. 16 at 7.)  The Court will address each in turn.

12          **A.  The ALJ Did Not Err in Evaluating Deiman's Credibility**

13          Deiman argues the ALJ erred in evaluating the credibility of his statements

14  regarding the severity of his symptoms.  (Doc. 16 at 7.)  In evaluating credibility, the ALJ

15  is required to engage in a two-step analysis:  (1) determine whether the claimant

16  presented objective medical evidence of an impairment that could reasonably be expected

17  to produce some degree of the pain or other symptoms alleged; and, if so with no

18  evidence of malingering, (2) reject the claimant's testimony about the severity of the

19  symptoms only by giving specific, clear, and convincing reasons for the rejection.

20  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).   "In reaching a credibility

21  determination, an ALJ may weigh inconsistencies between the claimant's testimony and

22  his or her conduct, daily activities, and work record, among other factors."  *Bray v.*

23  *Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009).

24          At the hearing, Deiman testified that he has held approximately twenty-one jobs in

25  the past fifteen years due to "issue[s] getting along with [his] bosses, [his] fellow

26  employees, and . . . get[ting] really bored easily and distracted."  (A.R. 48-49.)  He stated,

27  "I get easily distracted.  I need something different and new.  So I get frustrated in my

28  jobs and tend to have issues.  And either I walk out or I get fired."  (*Id.* at 49.)  Deiman

1    testified that he has problems with his bosses and coworkers because he "doesn't take too

2    kindly to being talked down to and it would happen pretty much at every job[.]" (*Id.*)  He

3    also disliked "having to take on everyone else's workload because everyone else is lazy."

4    (*Id.*)

5         The longest job Deiman sustained was eleven months when he worked at

6    Blockbuster Video.  (*Id.*)  It ended because he disagreed with new management.  (*Id.* at

7    50.)  Deiman noted that he occasionally has problems getting along with the general

8    public, but that "mostly it's my coworkers."  (*Id.*)  He stated that problems with

9    customers generally resulted from "[p]eople's attitudes when they come in."  (*Id.*)

10         Deiman testified that he is diagnosed as seriously mentally ill and suffers from

11   bipolar disorder, depression, anxiety and OCD.  (*Id.*)  He experiences "highs and lows" in

12   his mood, but experiences more of the "high" end of the spectrum.  (*Id.* at 51.)  This

13   results in panic attacks, "shaking, sweaty palms, pain in the chest, headaches," and his

14   mind races, which causes difficulty sleeping.  (*Id.*)  He experiences a small panic attack

15   every three months.  (*Id.* at 54.)  During the "high" phases he begins several projects but

16   rarely finishes them.  (*Id.* at 52.)  His "highs" can last several months, but he will then

17   experience a "low" where he is depressed and has attempted suicide.  (*Id.*)  These "low"

18   periods last for a month or two.  (*Id.*)  Deiman has two service dogs that help him with

19   his depression and mood swings.  (*Id.* at 53.)  He noted that it takes him longer to

20   complete tasks due to his OCD.  (*Id.* at 53.)  He has lost friends because of his mental

21   impairments because he "doesn't put up with much . . . BS."  (*Id.* at 54.)

22         With his friends, Deiman watches movies, plays video games, goes to the dog

23   park, and sometimes "just hang[s] out and talk[s] for hours about music and world

24   events."  (*Id.*)  He takes medication for his mental impairments, and the medications help

25   his symptoms.  (*Id.* at 55.)  They also help him get along with other people and he has

26   "learned to take a lot more stuff in stride . . . being on medication."  (*Id.* at 56.)  Deiman

27   uses medicinal marijuana to help with sleeping and mood.  (*Id.* at 57.)

28         The ALJ provided four reasons for discounting Deiman's credibility regarding the

1    severity of his symptoms.  First, the ALJ noted that Deiman engaged in work activity

2    after the alleged onset date, which indicates that his "daily activities have, at least at

3    times, been somewhat greater than the claimant has generally reported."  (*Id.* at 34.)

4    Second, the ALJ noted that Deiman's reported daily activities are inconsistent with his

5    allegations regarding the severity of his symptoms.  (*Id.*)  Third, treatment and

6    medication have been generally successful in controlling his mental symptoms.  (*Id.*)

7    Fourth, Deiman has made statements suggestive of poor work motivation.  (*Id.* at 35.)

8         "Evidence of work after the onset date is relevant to a claimant's credibility."

9    *Defrees v. Colvin*, No. CV-15-00339-PHX-DGC, 2015 WL 5675282, at *5 (D. Ariz.

10   Sept. 28, 2015); *see also Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (evidence

11   that claimant performed work "under the table" after the date of last insured is a clear and

12   convincing reason for discrediting claimant testimony).  Here, the ALJ noted that Deiman

13   reported beginning a new job in July 2012, (A.R. 717), and that he worked as a rickshaw

14   driver in November 2012 and January 2013, (*Id.* at 867).  Deiman claims these jobs

15   corroborate his testimony because they evidence his inability to maintain the jobs.  (Doc.

16   16 at 12.)  But Deiman provides no evidence that he quit these jobs because of his

17   symptoms, and his own testimony demonstrates that he generally could not maintain

18   work because he does not get along with his coworkers and is easily distracted.  (A.R.

19   50.)  The ALJ reasonably relied on Deiman's ability to work after the onset date as

20   evidence that his daily activities are "somewhat greater than normal," and thus this reason

21   for discounting Deiman's testimony is sufficient.

22        "[W]hether the claimant engaged in daily activities inconsistent with the alleged

23   symptoms" is relevant to a claimant's credibility.  *Molina v. Astrue*, 674 F.3d 1104, 1112

24   (9th Cir. 2012) (internal quotation marks omitted).  "Even where those activities suggest

25   some difficulty functioning, they may be grounds for discrediting the claimant's

26   testimony to the extent that they contradict claims of a totally debilitating impairment."

27   *Id.* at 1113.  The ALJ noted that Deiman engages in "daily activities consistent with good

28   mental functioning, including cooking, hiking, swimming, skateboarding, woodworking,

1
2
3
4
5
6
7

shopping for groceries, working out, walking his dog[s] and lifting heavy furniture." (A.R. 34.) Deiman also worked part-time as a rickshaw driver, which involves contact with the general public, worked on the computer, read, and socialized with friends. (*Id.*) Deiman argues that merely referencing these activities is insufficient, and that the ALJ failed to find these activities were inconsistent with Deiman's claimed limitations. (Doc. 16 at 13-14.) He also claims the ALJ ignored his history of aggression and anger-control issues. (*Id.* at 15.) The Court disagrees.

8
9
10
11
12
13
14
15
16
17
18
19

Deiman alleges that he cannot perform basic work-related activities, but his ability to perform his daily activities of living without difficulty, as well as his ability to socialize with friends, undermines his claims that his mental impairments render him unable to work at all. Furthermore, the ALJ noted that "[m]ental status examinations revealed infrequent anxiety, polite demeanor, good eye contact, cooperative behavior and positive attitude." (A.R. 34.) This undermines Deiman's claim that he cannot interact with coworkers and supervisors. Again, Deiman's own testimony suggests he does not get along with coworkers because he is not satisfied with his job duties, which makes him disinterested. In fact, when asked why he has held so many short-term jobs, he does not cite his mental impairments, but rather his boredom, distraction, and dislike of being "talked down to." (*Id.* at 48-49.) This reason for discounting Deiman's testimony is sufficient.

20
21
22
23
24
25
26
27
28

An ALJ may discount a claimant's credibility if the "statements at [his] hearing do not comport with objective evidence in [his] medical record." *Bray*, 554 F.3d at 1227. Here, the ALJ concluded that treatment and medication have been successful in managing Deiman's symptoms. (A.R. 34.) Indeed, while using his medication and attending counseling, Deiman's mental status examinations "were predominately unremarkable and the severity of his symptoms was described as mild-to-moderate." (*Id.*) Deiman argues his treatment was not successful, citing medical reports and records from 2003, 2004, 2009, and 2010 documenting suicidal thoughts and attempts. (Doc. 16 at 9.) He also points to the August 2010 SMI determination and accuses the ALJ of

1   relying on a "few isolated records." (*Id.* at 8-9.)  But, as the ALJ noted, the medical

2   evidence indicates that Deiman began to improve in October 2010. (A.R. 33.)  In May

3   2011, Deiman reported that his medications were "working well" and denied side effects.

4   (*Id.*)  In October 2011, his mental status exam was unremarkable, and he was noted as

5   being stable and improved. (*Id.*)  He exhibited positive behavior at his examinations and

6   in February 2013, he reported "feeling fine" and that he was having trouble finding a job,

7   not because of his mental symptoms, but because "he has a felony 3 charge against him."

8   (*Id.* at 856-58.)  In May 2012, he stated he is "doing well and is spending more time with

9   his girlfriend." (*Id.* at 840.)  The ALJ noted that although Deiman "has a long history of

10   mental illness . . . with treatment, his mental symptoms were no more than mild-to-

11   moderate and did not preclude him from engaging in good daily activities and

12   maintaining an active social life." (*Id.* at 33.)  The ALJ's finding is reasonable in light of

13   the medical records, *see Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th

14   Cir. 1999) ("Where the evidence is susceptible to more than one rational interpretation, it

15   is the ALJ's conclusion that must be upheld."), and thus this reason for discounting

16   Deiman's testimony is sufficient.

17        The ALJ may also rely other evidence such as poor work history in evaluating a

18   claimant's credibility.  *See Thomas*, 278 F.3d at 959.   Here, the ALJ concluded that

19   Deiman made statements suggestive of poor work motivation. (A.R. 35.)  For example,

20   in February 2013, a therapist recommended that Deiman seek a telemarketing job, but

21   Deiman stated that "[h]e wasn't really looking for that type of work." (*Id.*)  In addition,

22   Deiman noted that he was having trouble finding a job because of his felony conviction,

23   not because of his mental impairments.  Furthermore, Deiman's testimony suggests that

24   he does not respond well to being told what to do, which leads to problems with his

25   supervisors and coworkers.  In fact, he told his consulting psychologist that he "does not

26   like supervision or following direction" and that he "has 'walked off' several jobs[.]" (*Id.*

27   at 758.)  The Court finds the ALJ's interpretation of the evidence is reasonable, and this

28   reason for discounting Deiman's testimony is sufficient.

1      In conclusion, the Court finds the ALJ provided specific, clear, and convincing

2  reasons for discounting Deiman's credibility regarding the severity of his symptoms, and

3  that those reasons are supported by substantial evidence.  *Vasquez*, 572 F.3d at 591.[2]

4  **B.  The ALJ Did Not Err in Evaluating the Medical Source Evidence**

5      Deiman argues the ALJ erred in discounting the opinions of Dr. Safdar Ali and Dr.

6  Ronn Lavit.  He also argues the ALJ erred in affording significant weight to the opinion

7  of Dr. Susan Dougherty.  The Court disagrees.

8  **1.  Legal Standard**

9      In weighing medical source opinions in Social Security cases, the Ninth Circuit

10 distinguishes among three types of physicians:  (1) treating physicians, who actually treat

11 the claimant; (2) examining physicians, who examine but do not treat the claimant; and

12 (3) non-examining physicians, who neither treat nor examine the claimant.  *Lester v.*

13 *Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, more weight should be given to the

14 opinion of a treating physician than to the opinions of non-treating physicians.  *Id.*  A

15 treating physician's opinion is afforded great weight because such physicians are

16 "employed to cure and [have] a greater opportunity to observe and know the patient as an

17 individual."  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Where a treating

18 physician's opinion is not contradicted by another physician, it may be rejected only for

19 "clear and convincing" reasons, and where it is contradicted, it may not be rejected

20 without "specific and legitimate reasons" supported by substantial evidence in the record.

21 *Lester*, 81 F.3d at 830.  Moreover, the Commissioner must give weight to the treating

22

23 _____

23      [2] Deiman also claims the ALJ improperly discredited his mother's testimony.
   (Doc. 16 at 7.)   Deiman's mother, Candi Devereaux, submitted a Third Party Adult
24 Function Report describing Deiman's symptoms, daily activities of living, social
   activities, and other information regarding his condition.  (A.R. 154-63.)  An ALJ must
25 provide germane reasons for rejecting lay witness testimony.  *Molina*, 674 F.3d at 1114.
   Here, the ALJ noted that Devereaux's "statements appear to be mere extensions of the
26 claimant's own allegations," and thus the ALJ rejected her testimony for the same
   reasons he rejected Deiman's testimony.  (A.R. 35.)  An ALJ may rely on the same clear
27 and convincing reasons cited for rejecting a claimant's testimony to reject a family
   member's testimony that appears to be a restatement of the claimant's testimony.  *See*
28 *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009).  Because the
   ALJ provided clear and convincing reasons for rejecting Deiman's testimony, he did not
   err in rejecting Devereaux's testimony.

1   physician's subjective judgments in addition to his clinical findings and interpretation of

2   test results.  *Id.* at 832-33.

3   ### 2.  Dr. Safdar Ali

4   Dr. Safdar Ali, a psychiatrist, treated Deiman for his mental conditions for several

5   years and submitted two opinions in his regard.  Deiman argues the ALJ erred in (1)

6   disregarding one of Dr. Ali's opinions entirely, and (2) failing to "identify specific

7   records and provide his interpretation of *how* they were at odds with Dr. Ali's assessed

8   limitations."  (Doc. 16 at 19.)  Deiman also argues, without analysis, that the ALJ's

9   finding that Dr. Ali's opinions were inconsistent with the evidence in the record is

10  unfounded. (*Id.*)  Dr. Ali's opinions were contradicted by the opinions of Dr. Ronn Lavit

11  and Dr. Susan Daugherty, both of whom assessed lesser mental limitations.  Therefore,

12  the ALJ was required to provide specific and legitimate reasons supported by substantial

13  evidence for discounting Dr. Ali's opinions.  *See Lester*, 81 F.3d at 830.

14  In support of Deiman's claim, Dr. Ali submitted two medical opinions.  The first,

15  dated July 2011, is a "Certification of Disability for Eligibility Purposes" form.  (A.R.

16  658-59.)   The form contains three definitions of disability, including the definition

17  prescribed under the Social Security Act, and contains a section entitled "Certification of

18  Disability" with the following sentence:  "In my professional opinion, the application

19  DOES/DOES NOT meet the definition of a Disabled Person, as defined above."  (*Id.* at

20  659.)  Dr. Ali circled "DOES" and signed and dated the form.  But the form contains no

21  explanation, clinical evidence, or observations to support the conclusion.  Nor does it

22  specify, at a minimum, whether Deiman suffers from a physical, mental, or emotional

23  impairment.  This opinion is simply not probative as to whether Deiman is disabled, and

24  therefore the ALJ did not err by disregarding it.  *See Vincent ex rel. Vincent v. Heckler*,

25  739 F.2d 1393, 1395 (9th Cir. 1984) (noting that An ALJ need not discuss all of the

26  evidence in the record, only "significant probative evidence") (internal quotation marks

27  omitted).

28  The second opinion, dated July 2013, is a "Medical Assessment of Claimant's

1    Ability to Perform Work Related Activities (Mental)."  (A.R. 875-77.)  Therein, Dr. Ali

2    indicated that Deiman's mental impairments severely impacted his ability to relate to

3    other people; his ability to understand, carry out, and remember instructions; and his

4    ability to respond to customary work pressures.  (*Id.* at 875.)  Dr. Ali indicated that

5    Deiman had "moderately severe" limitations in his ability to respond appropriately to

6    supervision and respond appropriately to co-workers.  (*Id.*)  Dr. Ali further noted that

7    Deiman was "moderately" limited in his ability to sustain work pace due to his

8    impairments.  (*Id.* at 876.)  In the "comments" section, Dr. Ali wrote:  "Patient suffers

9    from chronic serious mental illness."  (*Id.*)

10          The ALJ assessed reduced weight to this opinion because "inconsistent with

11   [Deiman's] work activity after his alleged onset date, good daily activities, active social

12   life, positive response to medication management and treatment notes documenting

13   predominately mild-to-moderate symptoms."   (A.R. 35.)   Inconsistency with the

14   claimant's daily activities and work activity is a sufficient reason to discount medical

15   opinion testimony.  *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).  Here, the ALJ noted

16   that Deiman reported that he worked as a rickshaw driver, a job that requires significant

17   interaction with the general public, in June 2012.  (*Id.* at 33.)  Deiman also reported an

18   active social life and good daily activities, such as spending time with his girlfriend,

19   hiking, skateboarding, spending time with friends, and walking his dogs.  (*Id.*)  These

20   activities are inconsistent with Dr. Ali's July 2013 conclusions that Deiman has severe or

21   moderately severe limitations in relating to other people, co-workers, and supervisors.

22          In addition, an ALJ may reject opinion testimony that is contrary to demonstrated

23   improvement with medication and medical treatment.  *See Orn*, 495 F.3d at 631.  Deiman

24   claims the ALJ failed to set forth his own interpretations of the evidence and failed to

25   acknowledge the positive medical findings that supported a finding of disability.  (Doc.

26   16 at 9.)  But the ALJ thoroughly summarized Dr. Ali's treatment notes on the preceding

27   page and specifically referred to notes that favored Deiman's case.  For example, the ALJ

28   states that "[i]n January 2012 and April 2012, [Deiman's] mental symptoms were

1    moderate due to increase[d] anxiety symptoms.  (A.R. 33.)  The ALJ then notes that, "by

2    May 2012, his mental symptoms improved; he exhibited polite behavior, pleasant

3    demeanor and good grooming." (*Id.*)  The ALJ also noted that in February 2013, Deiman

4    reported "feeling fine" and "denied symptoms of mania, psychosis, depression and

5    anger." (*Id.*)  Dr. Ali's unsupported conclusions conflict with Deiman's self-reported

6    improvement, and thus the ALJ properly concluded that Dr. Ali's opinion was

7    inconsistent with Deiman's positive response to treatment.

8            Deiman claims that the ALJ's reasons are unsupported by the evidence.  However,

9    Deiman offers no explanation, points to no inconsistencies, and fails to cite a single piece

10   of contradictory medical evidence in the record.   In contrast, the ALJ thoroughly

11   summarized all of the key medical evidence, offered his interpretation, and set forth

12   specific and legitimate reasons supported by substantial evidence for discounting Dr.

13   Ali's medical opinion.  *See Lester*, 81 F.3d at 830.

14           **3.  Dr. Ronn Lavit**

15        In December 2012, Dr. Ronn Lavit, a consultative psychologist, examined Deiman

16   and assessed his capacity for mental work-related activities.  (A.R. 758-64.)   Dr. Lavit

17   opined that Deiman was unimpaired in his ability to "understand and remember simple

18   and complex instructions;" may be impaired in his ability to "sustain a normal routine

19   without special supervision due to mood swings, depression, anxiety/panic attacks and

20   not respecting authority figures;" may be impaired in his ability to "get along with c-

21   workers, respond appropriately to supervision and maintain socially appropriate

22   behavior;" would most likely "require a smaller work environment with limited

23   interaction with others;" and "may have limitations in his ability to respond appropriately

24   to heightened stresses/changes in the workplace." (*Id.* at 764.)   The ALJ gave

25   "significant weight to Dr. Lavit's opinion regarding [Deiman's] ability to perform simple

26   and complex instructions because it is consistent with his daily activities and mental

27   status examinations documenting good intellect, intact cognition and good

28   concentration." (*Id.* at 35.)  Significant weight was also afforded to the conclusion that

1   Deiman had the ability "to avoid normal hazards because it is consistent with [his] work

2   activity as a rickshaw driver and mental status examinations documenting intact insight

3   and intact judgment." (*Id.*)  The rest of Dr. Lavit's opinion was afforded reduced weight

4   "because it is somewhat vague and overly reliant on [Deiman's] subjective complaints,

5   which are inconsistent with treatment notes documenting an active social life, good daily

6   activities, work activity in a public setting and mild-to-moderate symptom severity."

7   (*Id.*)   The ALJ also noted that "Dr. Lavit's opinion is overly restrictive considering

8   [Deiman's] infrequent anxiety, good concentration, intact memory, polite demeanor,

9   good eye contact, cooperative behavior and positive attitude." (*Id.*)

10   Deiman argues the ALJ should have given greater weight to Dr. Lavit's opinion

11   regarding social interaction because it found several areas of limited ability based on

12   Deiman's self-reports, medical records, and examination findings.   (Doc. 16 at 21.)

13   Deiman also claims Dr. Lavit found Deiman credible, and that the record as a whole

14   demonstrates Deiman's "extensive history of ongoing serious mental illness, including

15   multiple suicide attempts; repeated episodes of suicide ideation; mood fluctuations;

16   aggressive behavior; anger-control issues; difficulty interacting with others; and limited

17   judgment, insight, and impulse control."   (*Id.* at 22.)   But the ALJ set forth several

18   specific reasons for discounting part of Dr. Lavit's opinion, and the ALJ's interpretation

19   of the evidence is reasonable.  Dr. Lavit's report indicates that Deiman "takes medication

20   and the medications work[s] a 8 out of 10 scale." (A.R. 758.)  The report documents an

21   extensive list of social activities, including spending time with several friends, girlfriend,

22   and interacting with over 375 Facebook friends.  (*Id.* at 759.)  In addition, Dr. Lavit's

23   findings regarding Deiman's ability to interact with others appear to based solely on

24   Deiman's reports, as the report documents that Deiman had appropriate hygiene, good

25   eye contact, was cooperative with Dr. Lavit, exhibited normal trust, exhibited warmth

26   during the exam, had appropriate mood, exhibited normal range of emotions, and was

27   otherwise personable during the exam.  (*Id.* at 760-61.)  Indeed, several other medical

28   records corroborate Deiman's stable emotional state. (*Id.* at 35.)  Furthermore, the ALJ

- 13 -

1    found Deiman's testimony regarding the severity of his symptoms not credible, which

2    undermines Dr. Lavit's reliance on Deiman's self-reported symptoms.  In sum, the ALJ's

3    interpretation of the evidence is reasonable given the evidence in the record, *see Batson v.*

4    *Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004) (noting that "the

5    Commissioner's findings are upheld if supported by inferences reasonably drawn from

6    the record, and if evidence exists to support more than one rational interpretation, we

7    must defer to the Commissioner's decision"), and the Court finds the ALJ set forth

8    specific and legitimate reasons supported by substantial evidence for discounting part of

9    Dr. Lavit's opinion.

10                                **4.  Dr. Susan Daugherty**

11         In January 2013, Dr. Susan Daugherty, a non-examining State agency

12   psychologist, reviewed Deiman's medical records and submitted a Mental Residual

13   Functional Capacity Assessment.  (A.R. 769-86.)  Dr. Daugherty opined that Deiman "is

14   able to perform work where interpersonal contact is incidental to work performed, e.g.

15   assembly work; complexity of tasks is learned and performed by rote, few variables, little

16   judgment; supervision required is simple, direct and concrete (unskilled)."  (*Id.* at 772.)

17   The ALJ afforded great weight to Dr. Daugherty's opinion "because it is consistent with

18   [Deiman's] occasionally anxious mood, diagnosis of borderline personality disorder with

19   positive response [to] treatment, active social life, good daily activities and mild-to-

20   moderate mental symptom[s]."  (*Id.* at 36.)

21         Deiman argues Dr. Daugherty failed to link her assessment to specific evidence in

22   the record, and thus the ALJ erred in affording her opinion great weight.  (Doc. 16 at 23.)

23   Deiman also argues the ALJ failed to explain how Dr. Daugherty's opinion is consistent

24   with the record.  (*Id.* at 24.)  He further argues that Dr. Daugherty's opinion is not

25   consistent with the record, and the ALJ failed to reconcile inconsistencies between his

26   assessment and Dr. Daugherty's assessment of the evidence.  (*Id.*)  The Court disagrees.

27         Dr. Daugherty provided an explanation of her findings and cited medical evidence

28   in the record, (A.R. 772), and the ALJ adequately explained that Dr. Daugherty's

1    assessment was consistent with the record medical evidence and cited several of those

2    records, (*Id.* at 36).  The ALJ's assessment need not exactly mirror the assessment of the

3    medical source opinion.  It must take into account all relevant evidence, which the ALJ

4    must then weigh, interpret, and offer his own conclusions.  Moreover, Deiman challenges

5    only one of the reasons cited by the ALJ: consistency with the medical evidence.  But

6    Deiman fails to explain how Dr. Daugherty's assessment is inconsistent with the medical

7    evidence.  He merely states that these "limitations did not adequately account for Mr.

8    Deiman's impairments."  (Doc. 16 at 25.)  Deiman also argues that he cannot work

9    because he dislikes following supervision and following directions, which leads to

10   confrontations with his supervisors.  But Deiman does not connect his problem with

11   authority to his mental condition.  And the ALJ's finding that Dr. Daugherty's opinion is

12   consistent with the medical record is reasonable.  Consequently, the ALJ did not err in

13   affording great weight to Dr. Daugherty's assessment.

14         **C.  The ALJ Did Not Err at Step Five**

15         Deiman argues the ALJ erred in relying on the Medical-Vocational Guidelines

16   (the "grids") in determining that he could perform other work.  (Doc. 16 at 25.)  The grids

17   "relieve the Secretary of the need to rely on vocational experts by establishing through

18   rulemaking the types and numbers of jobs that exist in the national economy."  *Heckler v.*

19   *Campbell*, 461 U.S. 458 (1952).  They are a matrix of the claimant's qualifications,

20   including RFC, which correspond with jobs requiring certain combinations of the

21   qualifications.  *Id.*  "Where a claimant's qualifications correspond to the job requirements

22   identified by a rule, the guidelines direct a conclusion as to whether work exists that the

23   claimant could perform."  *Id.*  "When the grids do no match the claimant's qualifications,

24   the ALJ can either (1) use the grids as a framework and make a determination of what

25   work exists that the claimant can perform, or (2) rely on a vocational expert when the

26   claimant has significant non-exertional limitations."  *Hoopai v. Astrue*, 499 F.3d 1071,

27   1075 (9th Cir. 2007).  However, "[w]hen a claimant's non-exertional limitations are

28   sufficiently severe so as to significantly limit the range of work permitted by the

1    claimant's exertional limitations, the grids are inapplicable." *Burkhart v. Bowen*, 856

2    F.2d 1335, 1340 (9th Cir. 1988) (internal quotation marks omitted).

3         Deiman asserts the RFC contains severe non-exertional limitations not accounted

4    for in the grids; specifically that he was limited to "simple, routine and unskilled work"

5    with no public contact.  (*Id.*)  But the ALJ found that the occupational base of work at

6    any exertional level is not significantly eroded where the claimant is precluded from

7    public contact and limited to simple, routine and unskilled work.  (A.R. 36.)  In other

8    words, the limitations are no so severe as to limit the types of jobs Deiman can perform.

9    Deiman fails to challenge these findings.  As such, the ALJ reasonably relied on the grids

10   as a framework in determining whether Deiman could perform other work.  *See Hoopai*,

11   499 F.3d at 1075.

12        **IT IS ORDERED** that the final decision of the Commissioner of Social Security

13   is **AFFIRMED**.  The Clerk shall enter judgment accordingly and terminate this case.

14        Dated this 27th day of April, 2016.

15

16

17   _____
     Douglas L. Rayes
18   United States District Judge

19

20

21

22

23

24

25

26

27

28